NEW YORK CENTRAL RAILROAD COMPANY *v.* CITY OF DETROIT.

HIGHWAYS AND STREETS—SPECIAL ASSESSMENTS—RAILROADS—PAYMENT UNDER PROTEST—EQUALLY DIVIDED COURT.

Judgments for defendant home-rule city in railroad company's action to recover payments of special assessments for development of heavy duty highway adjacent to railroad right-of-way, paid under protest, is affirmed by an equally divided court (CL 1948, §§ 117.4d, 211.53; Detroit City Charter, title 6, ch 3, § 2).

Appeal from Wayne; Maher (Thomas F.), J. Submitted April 11, 1958. (Docket Nos. 50, 51, Calendar Nos. 47,241, 47,242.) Decided December 3, 1958. Rehearing denied January 12, 1959. Claim of appeal denied by the Supreme Court of the United States May 18, 1959.

Two actions by the New York Central Railroad Company, a Michigan corporation, for itself and as lessee, assignee and subrogee of the Michigan Central Railroad Company, and the Michigan Central Railroad Company, a Michigan corporation, against the City of Detroit to recover payments, made under protest, of special assessments for development of heavy-duty highway adjacent to railroad right-of-way. Cases consolidated for trial and appeal. Judgments for defendant. Plaintiffs appeal. Affirmed by an equally divided court.

*Jack I. Alspector* and *Grey K. Nelson* (*George H. Wyatt,* of counsel), for plaintiffs.

*Nathaniel H. Goldstick,* Corporation Counsel, *Bert R. Sogge, Stephen J. Carey* and *Julius C. Pliskow,* Assistants Corporation Counsel, for defendant.

KAVANAGH, J. (*for affirmance*). Two actions were instituted by the New York Central Railroad Company as lessee, assignee and subrogee of the Michigan Central Railroad Company, and the Michigan Central Railroad Company against the city of Detroit to recover the amounts paid for assessments against railroad property for the paving of 2 portions of John Kronk avenue, formerly known as Southern avenue, in the city of Detroit.

The first segment paved extended from the westerly city limits of Detroit (bordering the city of Dearborn) easterly to Lonyo road. The property of plaintiffs bordered John Kronk on the south side and was assessed for $19,606.20. Appellants paid

this sum with interest, and sued to recover with interest. It was stipulated that plaintiffs' failure to institute suit on the first instalment was barred by a 30-day statute of limitation, and that the refund covering this portion of the street would be limited to $15,289.60.

The second segment paved extended from Lonyo road east to Central avenue. Appellants' property on the south side of John Kronk was assessed for $14,952.12, and some property on the north side of John Kronk was assessed for $432.16, making a total assessment for this segment of $15,384.28.

Both segments were ordered paved by the common council of the city of Detroit pursuant to title 4, ch 8, § 11 of the charter of the city of Detroit, as amended,* which provides for forced paving of streets and alleys, rather than upon the petition of abutting property owners.

The second portion was paved in the year 1955 following the acquisition of land by condemnation for the opening and widening of John Kronk between Lonyo road and Central avenue.

Appellants brought these actions below pursuant to section 53 of the general property tax law (CL 1948, § 211.53 [Stat Ann 1950 Rev § 7.97]) which provides a remedy for the recovery of a tax or special assessment paid under protest, within 30 days after such payment and protest, providing the tax or special assessment is shown to be illegal for the reason alleged in such protest.

It is important to a decision of this case that the language of the protests be set out in full. The reasons for protest with reference to the first assessment, mailed to the treasurer of the city of Detroit on May 22, 1953, were as follows:

---

* Detroit Municipal Code (1954), charter section, p 60.—REPORTER.

"This payment is made under protest because the so-called special assessment is illegal and void for the following reasons, among others:

"1. That the cost of said paving has not been equitably assessed against the lots or parcels of real estate to be benefited by such paving as required by the provisions of amended sections 2, 3 and 4 of chapter 3, title 6, of the charter of the city of Detroit,* adopted April 4, 1949, in effect April 5, 1949.

"2. That the property of the Michigan Central Railroad Company abutting that portion of Southern avenue which has been paved, as covered by said assessment roll, has by law been devoted permanently to the use to which it is now put, namely, as a site for an integral part of its common carrier railroad, devoted to the transportation, by railroad trains, of passengers and property in both intrastate and interstate commerce. That the fitness of its said property for such common carrier use is in nowise increased, nor is said property enhanced in value, by the said paving. That said paving was not laid to serve abutting property owners, but rather to take the heavy truck traffic off from other streets. It is to be used as a bridge for the movement of such heavy truck traffic destined between other points in the city and points located beyond, and operated by motor carriers which compete with the railroad company. That no part of the cost of said paving should be assessed against the property of the said railroad company.

"3. That the proposed assessment against the property of the Michigan Central Railroad Company violates the due process and equal protection clauses of the Fourteenth Amendment of the Constitution of the United States.

"4. That, as is shown on the street paving plan for Southern avenue, prepared in the city engineer's office, and contained in said assessment roll, said Southern avenue, between the city line and W.P.L.†

* Detroit Municipal Code (1954), charter section, p 173.—REPORTER.
† West property line (?).—REPORTER.

of Lonyo, was in fact paved, not as an ordinary street or highway, to serve the abutting property owners, but as a through superhighway, to be used as a bridge, for the handling of heavy truck traffic, destined between other parts of the city and points located beyond. Assessing your protestant for the sole benefit of its competitors constitutes a violation of the Fourteenth Amendment of the Constitution of the United States with respect to due process and equal protection and the due process provision of the Constitution of the State of Michigan.

"Said New York Central Railroad Company reserves the right to contest the decision in any manner which may be available for such purposes.

"This payment is made under protest, involuntarily and under duress to save the company and its properties from liens, distress, seizure and forfeiture, interest, and from such other fines and penalties as may be imposed and exacted."

The language of the second protest dated December 21, 1955, directed to the city treasurer, was as follows:

"The New York Central Railroad Company and its lessor, the Michigan Central Railroad Company, hereby protest payment of this so-called special assessment for the following reasons, among others:

"1.   The paving of John Kronk avenue is not required as a local or general improvement of the city of Detroit and is therefore beyond the power of said city to undertake under the provisions of its charter and laws.

"2. The paving of John Kronk avenue between Lonyo and Central, will not benefit the property of the Michigan Central Railroad Company abutting on the north and south of said highway, which property has by law been devoted permanently to the use to which it is now put, namely, as a site for an integral part of its common carrier railroad, devoted to the transportation by rail of passengers and property in both intrastate and interstate com-

merce. The fitness of said property for such railroad use is in no way increased, nor is said property enhanced in value, by the paving of John Kronk avenue. The said paving will not benefit the abutting property owners, but rather will benefit the city of Detroit and its west side residents exclusively, whose other streets will be thereby relieved of the annoyance and hazards of heavy industrial traffic. The said paving will in fact be a detriment to the railroad company in that, when completed, it will form part of a 'bridge highway' for the use and benefit of motor carrier competitors of said railroad. The assessment therefore violates amended sections 1, 2, 3, and 4 of chapter 3, title 6 of the charter of the city of Detroit.*

"3. The assessment violates the due process clause of section 16 of article 2 of the Michigan State Constitution (1908) and the equal protection of the law clause of the Fourteenth Amendment to the Constitution of the United States.

"4. The assessment is excessive, unreasonable, arbitrary, fraudulent, inequitable, unfair and capricious, in violation of the charter and laws of the city of Detroit and the Constitutions of the State of Michigan and of the United States, in that it requires the railroad to subsidize its trucking competitors, to its detriment and without any gain or return to it or its property.

"Said New York Central Railroad Company for itself and as lessee of the Michigan Central Railroad Company, and the Michigan Central Railroad Company, reserve the right to contest the determination of the Detroit common council in this matter in any manner which may be available for such purpose.

"Payment of said special assessment is made under protest, involuntarily and under duress, to save the said railroad companies and their properties from liens, distress, seizure and forfeiture, interest, and other fines and penalties as may be imposed and exacted."

---

* See footnote, *ante*, 640.—REPORTER.

The 2 actions were consolidated for trial, and a stipulation was entered into agreeing upon a number of facts with respect to the action, but providing for the introduction of evidence in addition thereto on the part of either party.

The lower court found that the plaintiffs were unable to show that no practical benefits whatsoever inured to their right-of-way now or in the foreseeable future; that the defendant in the making of this assessment followed the law and the city charter provision; that the assessments as they stand are perfectly proper and within the authority of the defendant city of Detroit. The lower court in its opinion found that that which benefits the local community and especially develops and improves the locality brings benefit to the railroad as the principal business institution thereabouts. The court further found as a matter of fact that the burden of proof rests with the plaintiffs of proving their allegations upon which their claim is based, particularly where it is sought to have a tax declared invalid. The court found that plaintiffs had failed to carry their burden of proof in this regard, and that, therefore, plaintiffs were not entitled to any relief in either case, and that a judgment in favor of defendant should be entered.

Plaintiffs appeal to this Court, claiming error on 13 points, all of which, we believe, are included in defendant appellee's following statement of questions involved:

1. "Was appellant's railroad right-of-way benefited by or susceptible of benefit from the paving of John Kronk avenue so as to support assessments placed thereon by appellee?"

2. "Were proceedings which resulted in these assessments against appellant's right-of-way in conformance with applicable statutory and charter provisions?"

3. "Did appellant sustain the burden of proof of illegality of these assessments for reasons specified in the respective written protests filed at the time of payment?"

It is the position of the plaintiffs that the railroad right-of-way has been operated as a switch yard for upwards of 100 years; that their right-of-way could not possibly benefit from the paving of John Kronk avenue; that the purpose of such paving was to establish a through route from the area of the Edsel Ford expressway in Dearborn to Livernois avenue in Detroit so as to be able to develop a heavy duty trucking "bridge-highway" to implement the through movement of heavy-truck traffic from other points in the metropolitan area to and from the area involved, and for the benefit of trucking competitors of appellants, particularly those operating terminals in the vicinity of the area paved, and to generally relieve the traffic congestion of heavy cargo-carrying motor vehicles in this area.

Plaintiffs urge that since the improvement was created for this purpose and for the benefit of the entire metropolitan area, the paving of John Kronk avenue was not a local improvement for which a special assessment could be levied under the charter of the city of Detroit, and particularly the provisions thereof which require assessment of the costs to properties which receive benefits from the paving. It is appellants' contention that their property does not benefit from the road, but that by reason of the additional traffic the paving is actually a detriment, in that it affords more competition by improving the road for their trucking competitors, and delays the operation of their trains and switch engines over the spur lines crossing John Kronk avenue. Appellants further allege that the assessment under these circumstances constitutes an arbitrary, inequitable, capricious, and unreasonable assessment on

its property and thereby deprives appellants of their property without due process of law and without just compensation contrary to the State and Federal Constitutions, in that other properties of the same class as plaintiffs' property have not been assessed on a like basis with railroad property.

Defendant city of Detroit denies that plaintiffs' railroad property was not benefited by the paving of John Kronk avenue, and alleges that the amounts assessed were the result of a special assessment duly and legally placed against the railroad premises in accordance with the statutes of the State of Michigan and the provisions of the charter and ordinances of the city of Detroit.

The first question to be decided by this Court is whether or not lands of a railroad company used solely for a right-of-way are subject to special assessments for street improvements.

It is the contention of plaintiffs that the paving of John Kronk avenue did not especially benefit the property of plaintiffs.

The general property tax act of the State of Michigan (PA 1893, No 206, as amended [CL 1948, § 211.1 *et seq.,* as amended; Stat Ann 1950 Rev § 7.1 *et seq.,* as amended]), in section 7, subparagraph 8 thereof, as amended by PA 1952, No 54 (CLS 1952, § 211.7 [Stat Ann 1953 Cum Supp § 7.7]), exempts therefrom real property used in its operation, except that the same shall be subject to assessments for local improvements in cities and villages.

Section 4d of the home-rule act (CL 1948, §117.4d [Stat Ann 1949 Rev § 5.2077]) authorizes a home-rule city to provide in its charter "for assessing and re-assessing the costs or any portion thereof, of any public improvement to a special district."

Title 6, chapter 3, § 2, of the Detroit charter* requires the common council to cause such portion of such street paving costs "as it may deem just to be equitably assessed against the lots or parcels of real estate to be benefited by such local improvement in proportion to the probable benefit to be derived therefrom."

In *Detroit, G. H. & M. R. Co.* v. *City of Grand Rapids,* 106 Mich 13 (28 LRA 793, 58 Am St Rep 466), it was held by a divided Court:

"A section of the right-of-way of a railroad company, occupied by its tracks and used for no other purpose, cannot be assessed for the expense of improving a street which crosses it, under a city charter requiring such assessments to be made according to benefits received." (Syllabus 2.)

The arguments used by plaintiffs in the instant case are the same arguments used by the railroad company to establish the rule of law above quoted.

This Court in the case of *Grand Rapids* v. *Grand Trunk Railway System,* 214 Mich 1, in an opinion written by Justice Clark, reviewed the law of Michigan with respect to railroad properties and quoted extensively from the case of *Louisville & N. R. Co.* v. *Barber Asphalt Paving Co.,* 197 US 430 (25 S Ct 466, 49 L ed 819), in which the question of benefits insofar as the present use of railroad property was discussed at length. The Court there said (p 7):

" 'That, apart from the specific use to which this land is devoted, land in a good-sized city generally will get a benefit from having the streets about it paved. * * * On the question of benefit or no benefit the land shall be considered simply in its general relations and apart from its particular use.' "

---

* Detroit Municipal Code (1954), charter section, p 173.—Reporter.

Justice CLARK, continuing, said (p 11):

"The weight of authority is, and we so hold, that the court may not say, as a matter of law, that the track, roadbed, or right-of-way of a railroad may not be benefited or susceptible of benefit by a local improvement."

We think the holding in *Detroit, G. H. & M. R. Co. v. Grand Rapids, supra,* must be overruled.

Under the authority of the above-mentioned cases there can be no question about the right of the city of Detroit to assess the special assessment in the event benefit does actually accrue.

The present use under the authority of *Grand Rapids* v. *Grand Trunk Railway System, supra,* and supported by the case of *Powers* v. *City of Grand Rapids,* 98 Mich 393, does not answer the question. The use to which the owner may choose to put such land, or whether he may see fit to put it to any use, is not the test but, rather, the possible use that the land might have to the present owner or his successor in title.

In the case of *Gingrich & Sons* v. *City of Grand Rapids,* 256 Mich 661, 667, 668, it is said:

" 'It is not the present use of property which determines the benefit it receives from a street improvement; it is, rather, its available use. Benefits are not to be measured by present actual uses but by potential uses.' "   (Quoting from trial court's opinion.)

We cannot say that the improvement does not benefit plaintiffs' property.

There can be no dispute about the fact that land in the city of Detroit located at this particular spot could have uses from which an owner would derive benefit from having a paved avenue along its 2-1/2 mile length. In addition to the special benefits, there is no question that by this paving benefits

accrued to the city at large. This is recognized by the fact that the common council directed the assessment of 50% of the cost of the paving to the city at large, included in which was the additional cost for the unusually wide pavement on John Kronk avenue and the extraordinary thickness of the pavement so as to handle the heavy traffic to which it was to be subjected.

Under the charter of the city of Detroit it was the responsibility of the common council to determine the territory benefited by the improvement, to determine the lands to be included in the assessment district, and the portion of the benefits especially derived by those lands from such improvement. This duty they carried out in accordance with the terms of the charter, and plaintiffs were afforded an opportunity to object—successfully in one instance —to the assessment of benefits.

We find nothing in the record to justify the statement that the assessments were arbitrarily, unreasonably, and capriciously made so as to constitute a fraud upon appellants which deprived them of their property without due process of law. On the other hand, the evidence discloses that consideration was given to the objections made through reduction of the amount to be paid by the abutting property owners and the amount to be paid by the city at large.

Since plaintiffs' land is properly in the district and receives special benefits from the paving, the question to what extent the value of their property was enhanced by the paving of the street is a question on which men may widely and honestly differ. It is a matter of judgment which the law and charter leaves to the common council and board of assessors and not to the courts. In the absence of fraud or bad faith or the following of a plan incapable of producing reasonable equality, their

judgment must be held to be conclusive. *Marks* v. *City of Detroit,* 246 Mich 517. It is not for the courts to say that this parcel of land is assessed too much or too little. The assessments were to be made according to benefits to each parcel of property, and there is nothing in the record showing that the common council did not assess the appellants' land in accordance with their best judgment.

The lower court found as a matter of fact that the record discloses no fraud, illegality or bad faith on the part of the defendant city of Detroit. In the absence of such a showing, this Court will not disturb the assessment. *Brown* v. *City of Grand Rapids,* 83 Mich 101; *Shimmons* v. *City of Saginaw,* 104 Mich 511; *Nelson* v. *City of Saginaw,* 106 Mich 659; *Power* v. *City of Detroit,* 139 Mich 30 (5 Ann Cas 645); *Berston* v. *City of Flint,* 176 Mich 266, 271; *Graham* v. *City of Grand Rapids,* 179 Mich 378 (Ann Cas 1915D, 380).

The burden of proof rests with plaintiffs of proving their allegations upon which their claim is based, particularly where it is sought to have a tax declared invalid. *Kelsey* v. *Township of Burns,* 223 Mich 173; *Rubatt* v. *Township of Wakefield,* 239 Mich 536.

Plaintiffs in this case have not sustained the burden of showing that the special assessments were not levied in proportion to the benefits derived, or that the common council abused its discretion. The common council is presumed to have acted in good faith, and to have exercised correctly the discretion reposed in them. *Powers* v. *City of Grand Rapids,* 98 Mich 393; *Shimmons* v. *City of Saginaw, supra; Graham* v. *City of Saginaw,* 317 Mich 427.

Appellants rely to a great extent on out-of-State authorities on the question of special benefits to the railroad property. We do not believe it is necessary to answer these cases in view of the decisions of the Michigan Court on this subject matter.

Appellants further rely upon *Dix-Ferndale Tax-payers' Association* v. *City of Detroit*, 258 Mich 390. This case is distinguishable from the present one. The Court therein said (p 395):

"The scheme of a wide cross-city thoroughfare has been partly carried out, but up to date stops short of the property of any plaintiff. The widening accomplished induces through traffic and creates a congested condition * * * only to be relieved by future extended widening, and the benefits then accruing will be assessed."

In the instant case the benefits accrue because of the possible use that could be made of the property at the present time.

The trial court heard the witnesses testify, observed their demeanor on the stand, and was in a far better position to determine the weight that should be given the evidence than is this Court.

The trial court found as a matter of fact that the plaintiffs had not carried the burden of proof, and they were, therefore, not entitled to a judgment. This Court, after carefully reviewing the record, is not persuaded that his conclusion was contrary to the preponderance of the evidence.

The judgment of the court below is affirmed, with costs to defendant.

DETHMERS, C. J., and CARR and EDWARDS, JJ., concurred with KAVANAGH, J.

BLACK, J. (*for reversal*). These suits were brought by plaintiffs* against the defendant city to recover the paid sum of special assessments made by the city against 4,300 feet of plaintiff's "right-

---

* Since New York Central and Michigan Central are legally united for present suit purposes, we shall in this opinion refer to them as "plaintiff" and "plaintiff railroad company."

of-way."*  Such right-of-way, including the adjacent Detroit classification yard of the plaintiff railroad company, is a part of the NYC "main line" between Detroit and Chicago.  The assessments were levied for "probable benefits" (quotation from the charter of the defendant city, under which the levy was made).  Allegedly these benefits have accrued and will accrue to plaintiff and its assessed property on account of the paving by defendant of that portion of John Kronk avenue (formerly Southern avenue), in Detroit, lying adjacent and parallel to such property.

The respective amounts sued for having been paid under statutory protest (in all they aggregate $35,575.43), and plaintiff having declared accordingly in the Wayne circuit, the 2 suits came to due issue and nonjury trial.  Judgment applicable to both cases entered for defendant.  Plaintiff appeals.

The vanguard question is whether the special assessment—for benefits that are said to accrue from a specific municipal improvement—of railroad trackage property by municipal authority, the assessment having been made and confirmed by the municipality according to requisite forms of law, is final (see dissent of HOOKER, J., in *Detroit, G. H. & M. R. Co. v. City of Grand Rapids,* 106 Mich 13, 16–18 [28 LRA 793, 58 Am St Rep 466]) and nonreviewable by the courts.†  It is answered by our disposition of the presently considered constitutional question.

---

* At the respective points of special assessment plaintiff's right-of-way includes the property on which its classification tracks are used and maintained.  This property is said to be the largest railroad classification yard in Michigan.  The first segment of special assessment, for the trackside paving of John Kronk avenue, extends 2,600 feet easterly, from the west city limits of Detroit, to Lonyo road.  The second segment of corresponding assessment extends an additional 1,700 feet easterly, from Lonyo to Central avenue.

† See *Grand Rapids* v. *Grand Trunk Railway System,* 214 Mich 1, in which the mentioned dissenting opinion of Justice HOOKER was followed and the majority opinion (in 106 Mich 13) was overruled.

Finding as we do that plaintiff has proved beyond assail, first, that neither the railroad nor its specially assessed property will in fact receive practical distinguished from fanciful benefit from the 2 segments of street improvement now scrutinized, and second, that such improvement was effectively designed, in part at least, to facilitate the business of plaintiff's chief carrier-competitors,* plaintiffs raised and saved Federal question (whether these assessments are "invalid, unlawful and void for the reason that it [they] violate the Fourteenth Amendment to the Constitution of the United States") comes to standing attention. Such question calls for examination of applicable decisions of the courts of the United States. The detail of facts will come later.

*First:* An excellent outline of principles, by which the asserted constitutional question can and should be tested, was written in 1947 by the court of appeals of the 10th circuit. We refer to the following connected passage, taken from the opinion in

---

* The motor truck was with us but a short time before the Federal supreme court was called upon to consider, in a "benefit" assessment case, the adverse impact—on the business of a railroad—of the improvement of a highway paralleling its tracks (*Road Improvement District No. 1* v. *Missouri P. R. Co.*, 274 US 188 [47 S Ct 563, 71 L ed 992]). Holding, as did the courts below, that the highway improvement assessment against the railroad "was plainly arbitrary and unreasonbly discriminatory," the supreme court in the cited case founded its decision on the following conclusions (p 194):

"From all the testimony we think there is ample ground for believing that the improved road will lead to an increase in the traffic and revenue of the railroad, as respects freight moving in carload lots and passengers travelling considerable distances, but that the benefit from this will be cut down by a substantial loss in local freight and passenger traffic attracted to motor-driven vehicles moving over the improved road. That such a loss in local traffic usually ensues when hard-surface roads adapted to use by motor-driven vehicles are constructed practically parallel to railroads is not only shown by the testimony but is common knowledge. It received distinct recognition in the President's message of December 8, 1922, to Congress."

*Morton Salt Co.* v. *City of South Hutchinson* (CCA), 159 F2d 897, 901:*

"But, however great the legislative power of taxation, it is not wholly without constitutional limitations. The due process and equal protection clauses of the Constitution do provide some measure of protection against the abusive exaction of a tax. The test of due process, say the courts, is whether the taxing power exerted by the State bears fiscal relation to protection, opportunities and benefits given by the State. In other words, the query is, what has the State given for which it may ask return. *Wisconsin* v. *J. C. Penney Co.,* 311 US 435 (61 S Ct 246, 85 L ed 267). If the tax imposed clearly results in such a flagrant and palpable inequality between the burden imposed and the benefit received that it amounts to an arbitrary taking of property without compensation, it is said to violate the due process guaranty under the Fourteenth Amendment. All of the cases which have affirmed the broad powers of taxation have recognized these limitations, *i. e.,* see *Dane* v. *Jackson,* 256 US 589 (41 S Ct 566, 65 L ed 1107). *Henderson Bridge Co.* v. *Henderson City,* 173 US 592, 614 (19 S Ct 553, 43 L ed 823); *Houck* v. *Little River Drainage District,* 239 US 254 (36 S Ct 58, 60 L ed 266), 1 Cooley, Taxation (4th ed), § 144."

Proceeding farther, and on page 902 of report of *Morton,* due emphasis was placed on Mr. Justice COOLEY's oft-quoted "constitutional test."† The court said:

---

* Two opinions of *Morton* were handed down by the 10th circuit court. The first, from which these quotations have been taken, was given on appeal from denial of a temporary injunction. The second, reported in 177 F2d 889, was handed down following trial of the merits and appeal from judgment of the district court. It does not appear that certiorari to review either decision was applied for.

† See employment thereof in *Wisconsin* v. *J. C. Penney Co.,* 311 US 435, 444, in these words: "The simple but controlling question is whether the State has given anything for which it can ask return."

᠂ "Whether the exaction is in the form of a special assessment for a special improvement, or a general tax for the general welfare, the constitutional test is always whether anything is given or offered for that which is taken. Indeed, the underlying purpose for the creation of special taxing districts is to attain a constitutional balance in relationship to benefits conferred for burdens imposed. 1 Cooley, Taxation (4th ed), § 320."

From these general principles we move to consideration of defendant's contention that *Louisville & N. R. Co.* v. *Barber Asphalt Paving Co.,* 197 US 430 (25 S Ct 466, 49 L ed 819) (followed in *Grand Rapids* v. *Grand Trunk Railway System, supra*), requires denial of plaintiff's appeal to the Fourteenth Amendment. Admittedly, on its apparent face, *Louisville* tends to support conclusion that special assessments of present nature do "not go beyond the bounds set by the Fourteenth Amendment of the Constitution of the United States." *Louisville,* however, was later restricted in scope by the same court and the same writer (Mr. Justice Holmes). As was noted in the ensuing case of *Martin* v. *District of Columbia* (cited and quoted below), "Constitutional rights like others are matters of degree." By force of such "degree" standard, *Louisville* must be read in the light of later decisions of the supreme court.

In *Martin* v. *District of Columbia,* 205 US 135 (27 S Ct 440, 51 L ed 743), the court was called upon to consider another like case, that of validity of special assessments to defray the cost of widening an alley in Washington. The alley extended through a "square," corresponding with what is commonly known as a city block. Having referred to the act of Congress under which the assessments were authorized, and having determined to quash the assessments in question, the court said (per Holmes, J., pp 138, 139) :

"The charges in all cases are to be apportioned within the limited taxing district of a square, and therefore it well may happen, it is argued, that they exceed the benefit conferred, in some case of which Congress never thought and upon which it could not have passed. The present is said to be a flagrant instance of that sort. If this be true perhaps the objection to the act would not be disposed of by the decision in *Louisville & N. R. Co.* v. *Barber Asphalt Paving Co.,* 197 US 430. That case dealt with the same objection, to be sure, in point of form, but a very different one in point of substance. The assessment in question there was an assessment for grading and paving, and it was pointed out that a legislature would be warranted in assuming that grading and paving streets in a good sized city commonly would benefit adjoining land more than it would cost. The chance of the cost being greater than the benefit is slight, and the excess, if any, would be small. These and other considerations were thought to outweigh a merely logical or mathematical possibility on the other side, and to warrant sustaining an old and familiar method of taxation. It was emphasized that there should not be extracted from the very general language of the Fourteenth Amendment, a system of delusive exactness and merely logical form.

"But when the chance of the cost exceeding the benefit grows large and the amount of the not improbable excess is great, it may not follow that the case last cited will be a precedent. Constitutional rights like others are matters of degree. To illustrate: Under the police power, in its strict sense, a certain limit might be set to the height of buildings without compensation; but to make that limit 5 feet would require compensation and a taking by eminent domain."

In *Phillip Wagner, Incorporated,* v. *Leser (Baltimore City),* 239 US 207 (36 S Ct 66, 60 L ed 230) the general rule of *Louisville* and like cases came to

consideration and application, followed by this language (pp 219, 220):

"We do not understand this to mean that there may not be cases of such flagrant abuse of legislative power as would warrant the intervention of a court of equity to protect the constitutional rights of landowners, because of arbitrary and wholly unwarranted legislative action. The constitutional protection against deprivation of property without due process of law would certainly be available to persons arbitrarily deprived of their private rights by such State action, whether under the guise of legislative authority or otherwise."

In *Gast Realty and Investment Co.* v. *Schneider Granite Co.,* 240 US 55 (36 S Ct 254, 60 L ed 523) Mr. Justice Holmes, speaking again for the court, said this (pp 58, 59):

"The legislature may create taxing districts to meet the expense of local improvements and may fix the basis of taxation without encountering the Fourteenth Amendment unless its action is palpably arbitrary or a plain abuse. *Houck* v. *Little River Drainage District,* 239 US 254, 262 (36 S Ct 58, 60 L ed 266). The front-foot rule has been sanctioned for the cost of paving a street. In such a case it is not likely that the cost will exceed the benefit, and the law does not attempt an imaginary exactness or go beyond, the reasonable probabilities. *French* v. *Barber Asphalt Co.,* 181 US 324 (21 S Ct 625, 45 L ed 879); *Cass Farm Co.* v. *Detroit,* 181 US 396, 397 (21 S Ct 644, 45 L ed 914). So in the case of a square bounded by principal streets the land might be assessed halfway back from the improvement to the next street. *Louisville & N. R. Co.* v. *Barber Asphalt Paving Co.,* 197 US 430 (25 S Ct 466, 49 L ed 819). But as is implied by *Houck* v. *Little River Drainage District,* if the law is of such a character that there is no reasonable presumption that substantial justice generally will be done, but the

probability is that the parties will be taxed dispro-
portionately to each other and to the benefit con-
ferred the law cannot stand against the complaint of
one so taxed in fact.   *Martin* v. *District of Columbia,*
205 US 135, 139 (27 S Ct 440, 51 L ed 743)."

In *Branson* v. *Bush,* 251 US 182, 189, 190 (40 S Ct
113, 64 L ed 215), appears this reference to the
earlier cases mentioned above:

"The subject was carefully re-examined and the
law restated in cases so recent as *Phillip Wagner, In-
corporated,* v. *Leser (Baltimore City),* 239 US 207
(36 S Ct 66, 60 L ed 230), and *Houck* v. *Little River
Drainage District,* 239 US 254 (36 S Ct 58, 60 L ed
266) with the result that the rule as we have stated it
was approved, with the qualification, which was be-
fore implied, that the legislative determination can
be assailed under the Fourteenth Amendment only
where the legislative action is 'arbitrary and wholly
unwarranted,' 'a flagrant abuse, and by reason of its
arbitrary character is mere confiscation of particular
property.'   And see *Withnell* v. *Ruecking Construc-
tion Co.,* 249 US 63, 69 (39 S Ct 200, 63 L ed 479);
*Hancock* v. *City of Muskogee,* 250 US 454, 457 (39
S Ct 528, 63 L ed 1081); *Embree* v. *Kansas City Road
District,* 240 US 242, 250 (36 S Ct 317, 60 L ed 624)."

In *Kansas City Southern R. Co.* v. *Road Improve-
ment District No. 6,* 256 US 658 (41 S Ct 604, 65 L ed
1151), *Gast, Houck, Louisville* and *Branson* were re-
viewed and the following declarations were made (p
661):

"Obviously, the railroad companies have not been
treated like individual owners, and we think the dis-
crimination so palpable and arbitrary as to amount
to a denial of the equal protection of the law.   Bene-
fits from local improvements must be estimated upon
contiguous property according to some standard
which will probably produce approximately correct
general results.   To say that 9.7 miles of railroad in

a purely farming section, treated as an aliquot part of the whole system, will receive benefits amounting to $67,900 from the construction of 11.2 miles of gravel road seems wholly improbable, if not impossible. Classification, of course, is permissible, but we can find no adequate reason for what has been attempted in the present case. *Royster Guano Co.* v. *Virginia,* 253 US 412, 415 (40 S Ct 560, 64 L ed 989). It is doubtful whether any very substantial appreciation in value of the railroad property within the district will result from the improvements; and very clearly it cannot be taxed upon some fanciful view of future earnings and distributed values, while all other property is assessed solely according to area and position. Railroad property may not be burdened for local improvements upon a basis so wholly different from that used for ascertaining the contribution demanded of individual owners as necessarily to produce manifest inequality. Equal protection of the law must be extended to all."

In *Thomas* v. *Kansas City Southern R. Co.,* 261 US 481 (43 S Ct 440, 67 L ed 758), the issue being validity of assessments for drain benefits against the appellee railroad companies (they were assessed to the tune of 57% of the burden), rules of the *Houck, Branson* and *Kansas City Southern Cases* were considered and these conclusions reached (p 485):

"The tax laid imposes upon the railroad, which can receive no direct or immediate benefit, a very heavy burden; and the lands which will receive a large direct (and possibly immediate) benefit, are required to bear only a very small part of the burden. The market value of the 12,000 acres may increase largely before any additional land is cultivated, or even before the improvement is made. The railroad can derive the indirect benefit, through increased traffic, only after the drainage of the wild lands has been effected and the reclaimed lands are being cultivated. The work of reclamation had not even begun.

Obviously there could not be any increase in traffic receipts during the year 1918, in which the tax is laid. Appellants argue that the assessed valuation of the lands would probably be greatly raised in later years; that the assessment upon the railroad property would probably not be raised; that the proportion of the annual burden imposed upon the railroad would diminish from year to year; and that, in course of time, the aggregate of the taxes levied upon each piece of property would be thus adjusted so as to correspond to the benefits received. This argument is relied upon to save the scheme of apportionment. But it rests wholly upon prophecy. The fact is that the tax levied is grossly discriminatory. The best that can be said of the scheme of taxation (so far as it concerns the railroad) is that the burdens imposed will grow less, as its ability to bear them grows greater."

Finally, and in *Nashville, C. & St. L. R. Co.* v. *Walters,* 294 US 405 (55 S Ct 486, 79 L ed 949), we find that the supreme court was asked to examine, under the Fourteenth Amendment, a Tennessee statute requiring that half the total cost of each rail-highway grade separation as ordered by a State commission—be paid by the railroad. The court, speaking through Mr. Justice Brandeis, announced the principal question this way (p 413):

"The main contention is that to impose upon the railway, under these circumstances, 1/2 of the cost is action so arbitrary and unreasonable as to deprive it of property without due process of law in violation of the Fourteenth Amendment;"

and then added these words of present significance (pp 426, 429, 430):

"The new highway, paralleling lines of the railway and intended for rapid moving motor vehicles, will, through competition for both freight and passenger traffic, seriously decrease rail traffic and deplete the

railway's revenue and net earnings. Practically all vehicles moving upon it will directly or indirectly compete for traffic with the railway. Buses will operate over the new highway in regular scheduled movements in the same way as passenger trains. Trucks, some of them 70 feet in length and many weighing with load as much as 50,000 pounds, operated by common carriers, by contract carrier and by private concerns, will compete for the most profitable classes of freight. The competition besides reducing the volume of traffic will compel reduction of rates.
\*   \*   \*

"While moneys raised by general taxation may constitutionally be applied to purposes from which the individual taxed may receive no benefit, and indeed, suffer serious detriment (citing cases); so-called assessments for public improvements laid upon particular property owners are ordinarily constitutional only if based on benefits received by them. (Citing cases including *Gast* and *Kansas City Southern R. Co.* v. *Road Improvement District.*)"

Following its report, *Nashville* was the subject of searching thought as shown by 3 law review articles from which we quote:

"Mr. Justice Brandeis's opinion marshalls the special facts relating to 'changed economic and transportation conditions' in an impressive review, in which he draws generously on extra-legal material, such as the Reports of the Chief of Federal Bureau of Public Roads, other Federal and administrative reports, insurance bulletins on accident statistics and presidential messages. The opinion indicates that those facts involve a major question relevant to the constitutionality of the statute: the question of the railway's responsibility for, or interest in, the elimination of the danger and the improvement of traffic conditions necessitating the underpass. The decision compelling a consideration of the facts emphasizes also the legal significance attached by the majority in this case to the 'changed economic and

transportation conditions' of the present day." (23 California L Rev 633.)

"While the court held that competition between motor vehicles and the railroads had reached proportions significant enough to merit consideration in determining whether a particular assessment on a railroad is constitutional, it found it difficult to reconcile the result arrived at with well settled principles. For in previous cases in this field, which hold without dissent that a State may require a railroad to contribute up to the full cost where an underpass is found necessary for the public safety and where the cost of its construction is reasonable, the factor of motor competition and the other arguments raised by the railroad in the instant case were expressly and consistently held to have no bearing on the constitutional issue. While the holding of the court is reached by excepting this case from prior decisions on the basis of its special facts, its effect is to widen the scope of inquiry into the reasonableness of grade-crossing elimination orders by including all the factors relevant to the determination of that broad issue." (44 Yale LJ, pp 1261, 1262.)

"That the law of railroads—and perhaps of other common carriers—is entering upon a period of metamorphosis does not seem to be an extravagant prediction. Rather does it appear to be an almost inevitable conclusion. An unmistakable warning of that change is implicit throughout the opinion of the supreme court of the United States in the case of *Nashville, C. & St. L. R. Co.* v. *Walters.* It is not the actual decision in the case which prompts the above prediction; it is the discussion of Mr. Justice Brandeis." (13 North Carolina L Rev 491.)

*Atchison, Topeka & S. F. R. Co.* v. *Public Utilities Commission of California,* 346 US 346 (74 S Ct 92, 98 L ed 51), is not opposed to applicability here of foregoing standards. In that case *Nashville* was carefully distinguished below this significant preface (p 352):

"These [in *Atchison*] were not improvements whose purpose and end result is to enhance the value of the property involved by reason of the added facilities, such as street, sewer or drainage projects, where the costs assessed must bear some relationship to the benefits received." (Citing *Gast* and *Kansas City Southern, supra*.)

The ground rules are before us. Next come the facts.

*Second:* It is testimonially established that the pavement of John Kronk, for the construction of which plaintiff's right-of-way has been specially assessed for benefits, was poured of extra thickness of concrete to withstand continuous use by heavy trucks and, for the same reason, that the pavement was constructed of 44-foot width rather than the customary 30-foot paved width of a street. Necessarily, such construction contributed materially to increased cost of the project.

It is similarly established that more than a mile of the area opposite plaintiff's specially assessed right-of-way, which area extends along the north side of John Kronk from the west city limits (of Detroit) to Martin avenue, is zoned by defendant as "heavy industrial." Such area is principally devoted to industrial operations and use (for truck "terminals") by a substantial number of national and local carriers of freight by motor truck. That the 2 paving projects were designed to provide needed relief, for nearby streets of Detroit, from heavy commercial traffic—likewise to provide a direct motor connection between the area and the presently described expressway,—was attested in a letter written by the clerk of the common council of Detroit, in 1953, to plaintiff's general counsel, having to do with the assessments in question. Consistent as it was with other record facts, some stipulated, some disputed, and some overwhelmingly established, the letter is

significant.   The concluding paragraph reads as follows:

"After receiving your appeal, an attempt was made to induce Wayne county to assume a portion of the expense of this project because, as planned, Southern avenue will become a through highway connecting with the expressway system and should relieve certain State, county and city thoroughfares of considerable commercial traffic. The county has declined to assume any portion of the expense of this project, and therefore the common council must deny your appeal."

The steady passage of high-speed trains along the main line, adjacent as it is to the south side of John Kronk, and the exclusive utilization by the railroad of the nearby classification yard for handling of freight by rail, join in negation of utility of John Kronk in connection with the business of the railroad. No passenger depot is situated in the vicinity of the assessment. The NYC freight station is nearly 4 miles away. There are no exit or entrance driveways to John Kronk from the right-of-way, likewise the yard, between the city limits and Lonyo and between Lonyo and Central avenue.* The railroad in these circumstances does not, and obviously cannot, make beneficial or other practical use of the improvement. And its property receives and will receive no "probable" or "potential" benefit therefrom. Defendant's suggestion to the contrary must, we think, be branded as resting "wholly upon prophecy." (See quotation from *Thomas, supra.*)  As was said of the same contention in *Northern Pacific R.*

---

* It was stipulated in the court below:

"The city proposes to extend the highway from Lonyo east to Livernois, and since the institution of this suit the city of Dearborn has extended Southern avenue from the city limits to Wyoming. The railroad has no private roadways or driveways leading from Southern avenue to any portion of its yard or other facilities."

*Co.* v. *City of Grand Forks,* — ND — (73 NW2d 348, 353):

"We think this argument is of little weight when applied to property which has been committed to a definite use by a substantial investment. Before the use of such property can be changed the investment therein may have to be sacrificed and a new investment made. Certainly that is true in the case of the lots under consideration. These lots have been occupied by railroad tracks for 60 years. It is highly speculative to assume that the railway company will now tear them up and build business buildings on the land. See *Rood* v. *City of Ames,* 244 Iowa 1138 (60 NW2d 227). To adopt the theory contended for would be to say that in order to prevent a future wholly speculative injustice, we must approve one which is both immediate and certain."

Against this factual background the defendant city, over timely and due protest of the plaintiff railroad, has proceeded to specially assess plaintiff's described right-of-way (first project) in the total sum of $19,606.20. This is more than 50% of the total amount specially assessed in the special assessment district. Likewise, referring now to the second project, the defendant city over similar protest has proceeded to specially assess plaintiff's right-of-way in the total sum of $15,384.28. Here again the total amount assessed is more than half the total amount specially assessed for the project. All this, we conclude, suggests firm ruling that the city has given nothing of special benefit to the railroad for that which it proposes to take. There is more to be said, however.

The western city limits of Detroit at this point are the east city limits of Dearborn. Next, going west, come a succession of steadily burgeoning villages and cities bidding fair, ere long, to make of Wayne and Washtenaw counties a continuous series of mu-

nicipalities lying athwart plaintiff's 100-year-old Detroit-Chicago right-of-way. Proceeding westward along that right-of-way, with lesser yet similar augury, we find the row of developing municipalities that are located in Jackson, Calhoun and Kalamazoo counties. And paralleling the right-of-way, never far distant therefrom, is the planned and partially completed "Detroit-Chicago industrial expressway."

Should we affirm the judgment of the circuit court, will not Detroit and Dearborn stand free to correspondingly assess plaintiff's said right-of-way for more "benefits" arising from the planned improvement (of extended and opened John Kronk)? Such improvement already is due to extend east and west an additional 1–1/2 to 2 miles. Will not each of the other cities and villages, on and on toward the setting sun, be enabled at will to "beneficially" assess plaintiff's right-of-way to meet half or more the cost of paving present and future trackside streets or highways? At this specially levied cost-rate of at least $50,000 per rail mile, even the greatest railroad of the United States might, in event of such affirmance, be forced out of the rail carrier business in Michigan. The portents of the judgment below thus become sobering if not alarming, assuming in each future instance that the facts showing absence of benefit remain constant.

This Court, equally with the courts of the United States, is obliged to guard and enforce rights secured by the national Constitution whenever those rights are properly asserted in any suit or proceeding before it (*United States* v. *Bank of New York & Trust Co.*, 296 US 463, 479 [56 S Ct 343, 80 L ed 331]). Here the plaintiff railroad company has duly asserted, and has overwhelmingly supported, a right guaranteed by the Fourteenth Amendment—that of immunity from discriminatory and confiscatory local taxation. We must, in the order of things, uphold

that right regardless of offense, if any, to our own decisions.

The defendant city places, we think, undue reliance on *Louisville* and its utilization by this Court in *Detroit, G. H. & M. R. Co.* v. *City of Grand Rapids, supra.* In *Louisville* a "lot" only of the railroad was specially assessed. The assessment was comparably small in amount. Some evidence of indirect benefit to the lot, by virtue of the improvement, appeared to the satisfaction of a court which, in the year 1905, was considering the question of benefits accruing to the property of a railroad when competing motor trucks were not utilizing trackside paved improvements and were in fact unknown. The legislative judgment thus withstood the constitutional attack. Here more than three quarters of a mile of property, exclusively devoted to rail traffic, has been assessed for benefits when there is no benefit. Here punitive and arbitrary assessments amounting to more than $35,000 are involved, with more of the apparent same to come. We conclude in these circumstances that the rules last-quoted above (from *Nashville*) are decisive and that *Louisville* is not.

On foregoing premises we hold that the assessments in question arbitrarily discriminate against the plaintiff railroad in violation of rights secured to it by the Fourteenth Amendment. The judgment of the circuit court in these circumstances should be reversed with remand for entry of judgment, applicable to both causes, in favor of plaintiff. Plaintiff should recover costs.

SMITH and VOELKER, JJ., concurred with BLACK, J.

KELLY, J. (*for reversal*). From its protest to the council, throughout the trial, plaintiff has claimed that:

"The assessment is excessive, unreasonable, arbitrary, fraudulent, inequitable, unfair and capricious, in violation of the charter and laws of the city of Detroit and the Constitutions of the State of Michigan and of the United States, in that it requires the railroad to subsidize its trucking competitors, to its detriment and without any gain or return to it or its property."

Justice BLACK, agreeing with plaintiff, has stated:

"Plaintiff has proved beyond assail, first, that neither the railroad nor its specially assessed property will in fact receive practical distinguished from fanciful benefit from the 2 segments of street improvements now scrutinized, and second, that such improvement was effectively designed, in part at least, to facilitate the business of plaintiff's chief carrier-competitors. * * * The railroad in these circumstances does not, and obviously cannot, make beneficial or other practical use of the improvement. And its property receives and will receive no 'probable' or 'potential' benefit therefrom. Defendant's suggestion to the contrary must, we think, be branded as resting 'wholly upon prophecy.' "

I agree with Justice BLACK's conclusion. His opinion considers plaintiff's rights under the 14th Amendment. This opinion considers plaintiff's rights under the charter of the city of Detroit and under the Constitution and laws of this State.

Chapter 3, title 6, of the charter of Detroit,* confines the council's right to impose special assessments to an amount the council "may deem just to be equitably assessed against the lots or parcels of real estate to be benefited thereby in proportion to the probable benefits to be derived therefrom."

Plaintiff introduced proofs showing that it would not receive "probable benefits." The city did not in-

---

* Detroit Municipal Code (1954), charter section, p 173.—REPORTER.

troduce proof that plaintiff would receive "probable benefits," and confined its arguments to a possibility that (1) if plaintiff would some time in the future decide to construct offices or a mercantile type of building over the tracks then the paved highway would justify the assessment against plaintiff; (2) that there might develop in the future some type of carrier service known as a "piggy back" operation, which is the movement of loaded freight by truck trailer and rail flatcar.

The opinions of the trial court and Justice KAVANAGH do not state that plaintiff would receive "probable benefits." The trial court sustained the assessment because "that which benefits the local community and especially develops and improves the locality brings benefit to the railroad as the principal business institution thereabouts" and "the court is of the opinion that the benefits do not have to accrue immmediately, but could possibly accrue in the future."

Justice KAVANAGH's test as to propriety of the tax is as follows: "The possible use that the land might have to the present owner or his successor in title. * * * This particular spot could have uses from which an owner would derive benefit from having a paved avenue along its 2-1/2 mile length. * * * We cannot say that the improvement does not benefit plaintiffs' property."

Plaintiff's main track, linking Detroit with Chicago, is only 21 feet from the Kronk highway and there is no access for plaintiff from its property to said highway, and plaintiff does not want, nor does it seek, such access. Besides maintaining the main track between Detroit and Chicago, the property being assessed consists of the largest railroad yard in Michigan—a nerve center for freight classification. Plaintiff has used the property for railroad purposes

for over 100 years and has no intention to use it for any other purpose.

In a recent case (1956), *New York Central Railroad Co.* v. *Town of Glasgow*, 142 W Va 291 (95 SE2d 420, 425, 426), the supreme court of appeals of West Virginia considered a special assessment for paving a street paralleling the railroad's right-of-way, and stated:

" 'To justify an assessment of the kind here in question, the benefits accruing to the land by the improvement must be direct, immediate, appreciable, and certain, and not contingent, remote, and uncertain.' *Naugatuck R. Co.* v. *City of Waterbury*, 78 Conn 193, 196 (61 A 474, 475).   *   *   *

"The defendant contends that such benefits are to be determined with reference to the general uses to which the property is susceptible and with reference to its natural and unaltered physical condition rather than with reference to the use to which it is now devoted.   *   *   *

"The testimony is further to the effect that this land will not in all probability be abandoned by the plaintiff as a railroad or relocated within the next 100 years and certainly not within the time the improvements to these streets are in existence.  In such circumstances, are we to determine the value of this land for these improvements as it was originally, as farm land, for its possible use as a subdivision, or as presently used after the expenditure of much money for construction and maintenance for the purpose to which the owner has devoted it.  The trial court, in its opinion quoted *Sterling National Bank & Trust Co. of New York* v. *Charleston Transit Co.*, 126 W Va 42, 48 (27 SE2d 256), that 'Of course, determination of the question of benefits is not to be confined to the present use of the property involved.' This may be true, but at the same time the present use to which it is devoted cannot be excluded from consideration and some other possible but highly improbable use substituted in lieu thereof.   *   *   *

We are of the opinion that the land must be considered as of the time of the levy and its present use, that being its most advantageous present use, and when so considered, in consideration of the evidence in this case, the assessment certainly is not based on any benefit."

The trial court erroneously stated: "It must be borne in mind that no charge of fraud, or illegality, or bad faith is made by plaintiff against the defendant city of Detroit." When this case was called for trial, appellant's attorney stated he would request leave to amend if there was any doubt that plaintiff was claiming constructive fraud, and was advised by the court; in the presence and without objection of appellee's attorney, that appellant's contention in this regard was understood by both the court and appellee.

We have established by decisions of this Court that charter provisions control and a special assessment may only be sustained upon the theory that the property receives special benefits, different from the benefits of the general public, and that said benefits should be actual or probable benefits. We have further stated that to be valid an assessment for benefits derived from the improvements of a public highway must be based upon actual or probable benefits and assessments are void if made upon an arbitrary basis, and that if such assessments are arbitrarily and capriciously made an unlawful levy results and it is immaterial that the honesty of the assessing officer is not impugned. See *City of Lansing* v. *Jenison*, 201 Mich 491; *Hatch* v. *Michigan Central R. Co.*, 238 Mich 381; *Dix-Ferndale Taxpayers' Ass'n* v. *City of Detroit*, 258 Mich 390.

The home-rule act (CL 1948, § 117.4d [Stat Ann 1949 Rev § 5.2077]) authorizes Detroit to provide in its charter the applicable assessment provision.

The city stresses, and my associates comment upon, *Grand Rapids* v. *Grand Trunk Railway System,* 214 Mich 1. In this opinion the Court made its position clear that there must be a benefit to property to sustain a special assessment, by stating (p 5):

"It is a legislative policy of this State that railroad properties shall be subject to tax for local improvements. But if the track, roadbed, or right-of-way of a railroad is not susceptible of benefit from a local improvement a taxing of such property for such improvement would be wanting in the due process of law required by the Constitution."

In concluding its opinion, the Court said (p 11):

"The weight of authority is, and we so hold, that the court may not say, as a matter of law, that the track, roadbed, or right-of-way of a railroad may not be benefited or susceptible of benefit by a local improvement. No bad faith is charged and to what extent the property included in the assessment district was benefited and whether benefited or not were questions to be determined in the special proceedings. We cannot review the assessment."

This *Grand Rapids Case, supra,* did not hold, directly or indirectly, that a city charter provision in regard to special assessment should not prevail nor that railroads could be discriminated against.

The question presented in this appeal is not whether a city can assess a railroad or whether a city, having the right to assess, may assess for a greater amount than it should, but, rather, was there proof of probable benefits justifying the assessment against plaintiff.

The test is not the trial judge's test that benefits could "possibly accrue," or that "a possible use that the land might have to the present owner or its successor in title." The test is clearly set forth in the

charter, namely, proof of the presence or absence of probable benefits.

The special assessment of $35,575.43 against plaintiff did not meet the charter requirements and was "not in proportion to the probable benefits to be derived therefrom."

The judgment of the trial court should be reversed and the cause remanded for entry of judgment in favor of plaintiff. Costs to appellant.